UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

MADELEINE, L.L.C.,

                              Plaintiff,

              -v-

ALAN I. CASDEN,

                              Defendant.

----------------------------------------------------------- X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: JUN 2 0 2013
```

12 Civ. 2112 (KBF)

OPINION & ORDER

KATHERINE B. FORREST, District Judge:

This diversity action for breach of contract, conversion, and an accounting

was initially filed on March 22, 2012. (Compl., ECF No. 1.)  An Amended

Complaint was filed on February 11, 2013. (Am. Compl., ECF No. 26.)[1]  Plaintiff

Madeleine, LLC ("Madeleine") sues Alan I. Casden for amounts it claims are due

and owing under a promissory note dated March 11, 2002 (the "Promissory Note" or

"Note"), secured by a Pledge and Security Agreement dated as of March 11, 2002.

This Court held a two-day bench trial on April 29 and 30, 2013, during which it

heard from the two principals involved:  Casden, on behalf of himself, and Ron

Kravit, on behalf of Madeleine.[2]  For the reasons discussed below, this Court finds

---

[1] The Court granted plaintiff's motion to amend on February 27, 2013. (ECF No. 29.)
[2] The Court found both Casden and Kravit credible.  Each testified in a forthright and clear manner, answering questions directly.  They both conveyed an honest and professional demeanor.  The Court is convinced this is truly a case about a difference of view as to how a contract should be interpreted. Neither Kravit nor Casden appeared in any way to stretch the truth.

1

that Casden has not breached his obligations under the Note.  Judgment is

therefore entered in defendant's favor.[3]

The Court's findings of fact and conclusions of law are as follows:

## I.    FINDINGS OF FACT

Casden and Cerberus Partners, L.P. ("Cerberus"), a New York-based private

equity firm with more than $25 billion under management, have engaged in a

number of business transactions over the years.  Among those transactions was the

creation of a Real Estate Investment Trust ("REIT"), Casden Properties Inc. ("CPI").

Ninety-five percent of CPI was owned by a combination of Casden (49%) and

Cerberus (51%).[4]

Shortly before September 11, 2001, Casden and Cerberus explored a

potential merger of CPI with a large, publicly traded REIT, Apartment Investment

and Management Company, Inc. ("AIMCO").  Casden and his attorneys acted on his

behalf; Kravit, a Senior Managing Director of Cerberus (and a Vice President of the

Cerberus entity, Madeleine), along with various attorneys, acted for Cerberus.

Casden and Cerberus discussed AIMCO's possible acquisition of CPI for

consideration in the vicinity of a billion dollars.  In connection with AIMCO's

acquisition, Casden, Cerberus, and AIMCO intended to create a new entity, Casden

Properties LLC ("CPLLC"), to pursue future residential real estate development

opportunities in Southern California.  Cerberus would own 60% of the new entity,

---

[3] Count I is for breach of contract as to the Note; as the Court finds for defendant on this count, the remaining two counts (for Conversion, Count II and Accounting, Count III) also fail.

[4] Approximately 5% was also owned by individual employees and others, but the parties have used 49/51 as the appropriate split of ownership as between Casden and Cerberus.

and Casden and AIMCO were each to own 20%. CPLLC was also referred to as "Development LLC" or "DevCo." AIMCO insisted that Casden have at least a 20% ownership interest in CPLLC (Tr. 99, 237-38)[5] — to insure that he had sufficient motivation with respect to the success of the development efforts.

Following the market upheaval associated with 9/11, AIMCO lowered the amount it was willing to pay for CPI to approximately $800 million.[6] Casden and Cerberus discussed ways in which they could increase the amount of consideration. Ultimately, as part of their agreement with AIMCO to sell CPI and create CPLLC, AIMCO agreed that Casden and Cerberus would be paid an additional $125 million: $50 million guaranteed and to be paid out in equal quarterly amounts in accordance with their respective ownership percentages in CPI, and a possible additional $75 million in other fees (referred to as "Development Fees" in various documents). The Court finds that both the $50 million guaranteed and the $75 million in additional fees were part of the overall transaction consideration with AIMCO.

As CPLLC developed projects requiring capital, AIMCO, Casden, and Cerberus each were required to contribute funds in percentages commensurate with their ownership participation. According to the transaction documentation establishing CPLLC, Cerberus committed to fund up to $150 million, and AIMCO and Casden each agreed to fund up to $50 million.

---

[5] The transcripts for trial days April 29 and 30, 2013 are continuously paginated, thus the Court cites to them collectively. Transcript pages 1-234 pertain to April 29, and transcript pages 235-351 pertain to April 30.
[6] The actual amount was somewhere between $700 and $800 million, but for purposes of the trial, the parties agreed to use the number $800 million.

On December 3, 2001, the day before AIMCO was scheduled to announce the merger, Kravit and Stephen Feinberg of Cerberus informed Casden that Cerberus wanted a larger participation percentage in CPLLC. Cerberus wanted to own 70% of CPLLC. To that end, it sought to acquire half of Casden's 20% interest (sometimes referred to herein as the "10% Interest"). While Casden was not happy that this request was being made — and made at the last minute — he agreed to it in order to consummate the overall transaction.

The structure of the ensuing transaction — effecting the transfer of rights and obligations in Casden's 10% Interest in CPLCC, forms the heart of the dispute before the Court. It is essential to understanding the complexity of the transaction to place it against the background of AIMCO's requirement that Casden have a 20% interest in CPLLC. To maintain that 20% as an outward appearance, Cerberus and Casden agreed to a complicated transaction that was, as explained below, structured as a "loan" of the funding amounts for CPLLC that was associated with the 10% Interest. (That is, since Casden was obligated to fund up to $50 million for his 20% interest when he transferred the rights to the 10% Interest to Cerberus, Cerberus similarly took over the obligation to fund the $25 million associated with that portion of the interest.) (Id. at 99 ("Court: So was the loan to AIC for the purpose essentially of paying for that 10 percent of the 20 percent, but doing it under the radar so that AIMCO still believed that Mr. Casden had 20 percent overall interest? [Kravit]: Yes."); see also id. at 237, 239.) The Court finds that the

4

Supplemental Agreement was structured as a loan in order to obscure the fact that Cerberus was acquiring half of Casden's interest in CPLLC.

Casden and Kravit subsequently stayed up the better part of the night negotiating documentation that would reflect how this transfer of Casden's 10% Interest would be effected.  (Id. at 260.)  Casden and Cerberus entered into a side, supplemental agreement ("Supplemental Agreement"), dated December 3, 2001. (Trial Ex. 2.)[7]

The Supplemental Agreement provided that Casden would effectively "borrow" from Cerberus the $25 million necessary to meet the funding obligation corresponding to the 10% Interest he was transferring to Cerberus.  In return for that $25 million, Cerberus would receive payment of principal and interest as CPLLC successfully developed properties.  Kravit testified clearly and without hesitation that at the time that he and Casden entered into the Supplemental Agreement, he intended that Cerberus would be repaid out of the cash flows of CPLLC.  (Tr. 108.)  He also testified clearly and without hesitation that at the time that he entered into the Supplemental Agreement with Casden — which was one day before the AIMCO acquisition of CPI was announced — he did not intend that any portion of the $25 million would come out of the guaranteed $50 million to be paid quarterly by AIMCO to Cerberus and Casden as part of CPI's merger with AIMCO.  (Id. at 110, 169 ("Q: Now it wasn't your intent when you negotiated the documents to have the consulting fees be used to pay the [N]ote, correct? [Kravit]:

---

[7] In the Supplemental Agreement Cerberus is referred to as "Blackacre."

Correct.").)[8]  Casden testified consistently with Kravit.  When asked whether there was any discussion of how the Loan would be repaid he stated:  "Well, the loan would be repaid as if [Cerberus] owned the 10 percent.  So it was only out of profits and distributions from the sale and development of properties." (Id. at 240; see also id. at 264 ("[Casden]: . . . [I]t was to be repaid from the development — from the profits and proceed from the real estate developments . . . Q:  So was there ever any discussion that the consulting fees or the office building fees would be used to repay the loan? [Casden]:  No. I would never have agreed to that and they didn't ask for it.").)

Casden testified that the agreement for repayment was structured around the fact that with respect to his 10% Interest that was being acquired by Cerberus, he was "a warm body where it passed through . . . I wasn't supposed to have any liability on that 10 percent.  If they owned it directly, I wouldn't have any liability on it and we were putting them in the same standing as if they owned it."  (Id. at 244.)  Then Casden stated:

> [T]he consulting fees and office building fees were separate and apart from the ownership of DevCo.  Because that had already been negotiated with AIMCO to get that money as a result of our ownership in [CPI] and had nothing to do with DevCo.  I mean, those were monies that we specifically negotiated to get as additional consideration for the assets we were selling.

(Id. at 245.)  Casden testified that if the consulting and office building fees were used to pay down the Note, that would have put Cerberus in a better financial

---

[8] In connection with the merger with AIMCO, Cerberus is referred to as "XYZ Holdings."  The Agreement and Plan of Merger between AIMCO, Casden and XYZ Holdings was dated December 3, 2001.  (Trial Ex. 1.)  That agreement contains a standard integration clause at Section 10.3.  (Id.)

position than had they just received Casden's 10% Interest in DevCo — because

they would effectively be getting a piece of the 41% of CPI he had sold to AIMCO.

(Id.) The Court finds that the parties never intended that Casden would be

personally liable for the Loan. The Court also finds that the parties specifically did

not intend that the Loan would be repaid from the Consulting Fees.

    The Supplemental Agreement makes little sense unless placed into the

context the parties described at trial. Importantly, a plain reading of the

Supplemental Agreement does not reveal that the purpose of the "loan" was to effect

a transfer of Casden's 10% Interest in CPLLC to Cerberus. This is perhaps not

surprising in light of AIMCO's requirement that Casden maintain a 20% interest in

the project. For instance, Section 5 of the Supplemental Agreement states:

> Development LLC Matters.
>
> (a)   Loan to AIC [Alan I. Casden]. At the request of AIC,
> pursuant to mutually agreed documentation which includes the
> terms described herein, Blackacre shall lend up to an aggregate
> of $25 million to AIC in one or more installments on the
> following terms and conditions. The interest on the loans shall
> be (i) 15% per annum (compounded annually) plus (ii) contingent
> interest equal to 67% of all profits and distributions  on the
> interest of AIC (and his affiliates) in Development LLC acquired
> with the proceeds of the loans. The loans shall be secured by a
> pledge of a percentage of the interest of AIC (and his affiliates)
> in Development LLC equal to a percentage equivalent of a
> fraction, the numerator of which is the amount of loans made by
> Blackacre pursuant to this Section and the denominator of
> which is the amount of capital AIC (and his affiliates) have
> contributed to Development LLC. Interest and principal shall be
> payable only from distributions received by AIC (or his
> affiliates) from the interests Development LLC (but the
> maturity date of all such loans in any event shall be ten years
> from the date of closing of the Merger) pledged to secure the
> loans and shall otherwise be non-recourse to AIC. Proceeds of

> each of the loans would be used by AIC (or his affiliates) solely to make 50% of a capital contribution to be made to Development LLC by AIC (or his affiliates) . . . The documentation for a loan hereunder shall include other customary terms and conditions (including provisions regarding events of default and acceleration of amounts owed under the loans).

(Trial Ex. 2 at Sec. 5(a).)  Kravit testified that it was his intention for the "documentation" referred to in the last sentence of Section 5 quoted above to generally describe and reflect the terms set forth in Section 5(a).  (Tr. 104, 105.)

The transaction with AIMCO was announced on December 4, 2001 and closed in March 2002.  The Agreement and Plan of Merger was between AIMCO, CPI, and a newly created entity in which Casden and Cerberus own the majority interest, "XYZ Holdings."  (Trial Ex. 1; see also Trial Ex. 5 (XYZ Holdings LLC agreement).)

In connection with the closing, Casden and a Cerberus entity, Madeleine LLC, entered into a Promissory Note for $25 million.  (Trial Ex. 6.)  The Promissory Note provided the mechanism for the loan draw downs — and required that when Casden requested a loan draw, there not be "an event of default" then existing.  (Id. at Art. I(v).)  Casden testified that each time the Loan was drawn down, he certified that they were not in default.  (Def.'s Ex. 10; Tr. 272-73.)[9]  The Promissory Note also provides for repayment in the following manner:

### 1.1    Interest

1.1.1  Interest Rate and Interest Payments . . . Regular interest shall be paid in arrears in cash by the Borrower [defined as AIC and his affiliates] to the Lender [defined as Madeleine LLC] in an amount equal to the Specified Percentage of any distributions

---

[9] Cerberus never responded to such certifications by indicating that there was a default.  (Tr. 274.)

from the Company to, or for the benefit of, the Borrower, when and as received by the Borrower.[10]

(Trial Ex. 6 at Sec. 1.1.) The Promissory Note also contains a provision for payment

of "Additional Interest" in Section 1.1.2. That provision is not here at issue (since it

depends on the project achieving a certain amount of success, which did not

happen). The Note also contains a provision, Section 1.2, for return of principal

when the Borrower receives any distributions from the Company constituting a

return on capital. That provision is also not at issue because there was never a

return of capital.

Article V of the Promissory Note provides that the Borrower "shall not be

personally liable to pay the Loan, or any other amount due hereunder, except from

the sources specified herein." (Trial Ex. 6 at Art. V.)

Casden and Cerebus also entered into an "AMENDMENT NO. 1, dated as of

March 8, 2002 to the Supplemental Agreement and Mutual General Release dated

as of December 3, 2001" ("Amendment No. 1"). (Trial Ex 3.) Section 1.07 of

Amendment No. 1 provides:

> A new subsection (h) is added to Section 13 [the provision entitled Mutual General Release] to read in its entirety as follows:
>
> (h) <u>Controlling Provisions.</u> In the event of a conflict or inconsistency between the provisions of the XYZ LLC Agreement and the other agreements entered into between the parties hereto (or any affiliates thereof) in connection with the Transactions and the provisions of this Agreement, as between

---

[10] "Specified Percentage" is defined as "a fraction, expressed as a percentage, in which the numerator is the principal amount of the Loan and the denominator is the amount of capital the Borrower has contributed to the Company (whether with the proceeds of the Loan or otherwise.)" (Trial Ex. 6 at Art. IV.) "The Company" is defined as CPLLC. (<u>Id.</u> at Art. IV.)

> the parties hereto, the provisions of this Agreement shall control
> . . . .

(Id. at Sec. 1.07 (internal quotations omitted).)  In addition, Section 2.02 provides:

> Except as specifically amended above, the Supplemental
> Agreement shall remain in full force and effect and is hereby
> ratified and confirmed, and the terms of the Supplemental
> Agreement (as amended hereby) are incorporated herein by this
> reference as if fully set forth herein.

(Id. at Sec. 2.02.)

Kravit testified that as of the closing in March 2002, Cerberus specifically agreed that the Supplemental Agreement would remain in full force and effect and that it was ratified and confirmed.  (Tr. 159.)  The Court finds that the provisions of the Supplemental Agreement governing repayment of the Loan were intended to remain in force and effect.

Casden, Cerberus, and AIMCO entered into an operating agreement for CPLLC/DevCo dated March 8, 2002.  (Trial Ex 4.)  Article VI of this agreement provides for the manner and timing of distributions by DevCo.  Section 6.01 of this agreement provides for distributions of net cash flow to the members.  Section 6.01 provides that:

> Net Cash Flow shall be calculated without taking into account
> any items of revenue relating to the Consulting Agreement or
> the Office Building Management Agreement that are included in
> the calculation of the Special Distribution distributed pursuant
> to Section 6.02 (e.g., fees earned under either such agreement,
> which are part of the Special Distribution, shall not be taken
> into account in making calculations under this sentence.)

10

(<u>Id.</u> at Sec. 6.01.)  Section 6.01 uses the word "distributions" numerous times in its

lowercase form.  Section 6.02 sets forth various terms relating to "Special

Distributions; Subordination."  This section provides that:

> (a) Notwithstanding any other provision of this Agreement, including, without limitation, the distributions set forth in 6.01, (I) all fees under the Office Building Asset Management Agreement shall be distributed to Casden Member Blackacre Member, and AIMCO shall not be entitled to share in the same (the "Office Building Distribution"), and (II) all Development Fees paid to the Company pursuant to the Consulting Agreement, up to $125,000,000 (to the extent required as more particularly described in the Consulting Agreement)(the "Consulting Special Distribution" and, together with the Office Building Distribution, the "<u>Special Distribution</u>"), shall be paid to Casden Member and Blackacre Member, in the case of both clauses (I) and (II), immediately upon the payment of such amounts under such agreements, in accordance with the following, and AIMCO TRS shall not be entitled to share in the same:
>
> (i) First, 41% to Casden Member and 59% to Blackacre Member until such time as the aggregate amount distributed pursuant to this Section 6.02(a)(i) equals $50,000,000 . . . .

(<u>Id.</u> at Sec. 6.02(a).)  CPLLC and AIMCO also entered into a Consulting Agreement

effective as of March 11, 2002.  (Trial Ex. 8.)  Section 5 of this agreement provides:

> (a) Owner [defined as AIMCO] shall pay to Consultant [defined as CPLLC] on the first (1st) business day of the first (1st) full calendar quarter after the calendar quarter in which the Effective Date [defined as the March 11, 2002] occurs, and on the first (1st) business day of each calendar quarter thereafter during the Primary Term [defined as the first five years of the agreement], in each case, equal to $2,500,000 (for an aggregate amount of up to $50,000,000 during the Primary Term), as a deposit (the "Deposit") for Consultant's agreement to perform the Services hereunder.

(<u>Id.</u> at Sec. 5(a).)

Casden and Cerberus (through its entity, Madeleine) also entered into a Pledge and Security Agreement ("Pledge Agreement"), effective as of March 11, 2002. (Trial Ex. 7.) Section 1 sets forth provisions relating to the payment of the "Secured Obligations." "Secured Obligations" are defined in pertinent part as "all obligations of every nature of Pledgor [Casden] from time to time owed to Pledgee [Madeleine] under the Loan and the Note, and (b) all obligations of every nature of Pledgor from time to time under this Agreement . . . ." (Id. at Sec. 2.) Section 1 of the Pledge Agreement provides:

> (a) the Specified Percentage (as defined below) of all interests in DevCo, including the Specified Percentage of (i) all of Pledgor's limited liability company interests…and any interest of Pledgor on the books and records of such limited liability company or on the books and records of any securities intermediary pertaining to such interest, (ii) all distributions, cash, warrants, rights, options, instruments, securities, and other property and proceeds from time to time received, receivable or otherwise distributed to or for the account of Pledgor in respect of or in exchange for any or all of such limited liability company interests, and (iii) all rights, title and interest under the limited liability company agreement (including all amendments, modifications, and supplements thereto and restatements thereof) of DevCo (together, the "Pledged DevCo Interests") . . . .

(Id. at Sec. 1.)

Two weeks following the close of the transaction with AIMCO — on April 2, 2002 — Cerberus sent Casden a memorandum regarding the upcoming first of the quarterly payments by DevCo. (Def.'s Ex. 4.) The memorandum provided wiring instructions for Blackacre's 59% (or $1,475,000) of the $2.5 million payment. (Id.) At trial Casden testified that he received similar instructions each quarter until the guaranteed $50 million payment had been made in full. Notably, none of these

12

instructions from Cerberus indicate that all or any portion of the 41% of each distribution going to Casden should instead go to Cerberus/Madeleine for payment on the Loan.

Casden testified credibly that in April 2002, he and Kravit specifically discussed that the payments for the Consulting Fees would not be considered "distributions" pursuant to Section 6.01 of the CPLLC/DevCo operating agreement. (Tr. 247 ("I called Ron and said that special distributions are not included in any distributions and he said 'you're right.'").)

Auditor confirmations were sent annually to Cerberus and Casden; none indicated the Loan was in default. (Id. at 182, 271.) Kravit testified that as of April 2002, when the first quarterly payment of the Consulting Fees was made (and after $5 million had already been drawn down on the Loan), he did not believe any interest was due and owing from Casden. (Id. at 170; see also id. at 243 (Kravit stating "day one they put up $5 million.").)

Each month, CPLLC would distribute its financials to its members — Cerberus/Blackacre received copies. (Id. at 118-19.) The last page of these financials contained a page setting forth all distribution payments made to date. (See, e.g., Pl.'s Ex. 16.) A schedule on CPLLC's annual audited financial statements that Blackacre received also contained similar information. (Tr. 118-19; see, e.g., Pl.'s Ex. 18 at 4; Pl.'s Exs. 19-21.) Kravit testified that Cerberus/Blackacre relied on these financial statements. (Tr. 121.) Separately, Casden received monthly statements from Cerberus regarding the outstanding balance of the Loan. None of

these statements indicated that the Loan was in default. (Def.'s Ex. 6; Tr. 271.)
Nor did the statements indicate that default interest was due and owing. (Tr. 271-72.)

Blackacre created a Portfolio Asset Summary as of August 2005. According
to Kravit, this is an internal report that summarizes where Blackacre is on a project
or deal. (Def.'s Ex. 16; Tr. 183.) Each deal contains an entry setting forth "Business
and Action Plan," "Current Issues," and "Exit Strategy." (Def.'s Ex. 16.) Each deal
also has a column entitled "Watchlist Deal," which is filled in either "Yes" or "No."
The second page of this document describes the "Alan Casden – DevCo Loan." As
of August 2005, the Alan Casden loan was not listed as a watchlist deal. (Id. at 15
of 72.) Under "Business and Action Plan," the document states: "Monitor Casden
DevCo position." (Id.) The field for "Current Issues" is blank. (Id.) Under "Exit
Strategy" it states: "Repayment from distributions upon completion/disposition of
Casden developments." (Id.) This is preceded by the notation "As Underwritten."
(Id.; see also Tr. 184-85.) At trial, Kravit agreed that the phrase "as underwritten"
meant as underwritten in March of 2002. (Tr. 185.) Kravit also agreed that none of
the portfolio summaries Blackacre created on a quarterly basis (starting at the
beginning of the deal), ever stated that interest would be paid on the Madeleine
note with the consulting fees. (Id. at 185-86.)

Kravit also testified that he was unaware of any document during the period
from 2001-2011, including any pro formas or schedules prepared, that show interest
on the Note as payable from the Consulting Fees. (Id. at 164.)

14

In 2007, in connection with a routine audit of Blackacre by PriceWaterhouseCoopers LLP, Casden and Cerberus communicated regarding the appropriate method of calculating interest.  Casden reminded Cerberus that pursuant to the Supplemental Agreement, interest should be compounded annually. (Def.'s Ex. 5.)  Cerberus agreed and calculated interest in that manner going forward.  (See, e.g., Def.'s Ex. 6.)

Kravit testified that he did not view the Loan as being in default between 2002 and 2011 — and that his reading of the Note formed the basis for his view. (Tr. 176, 189 ("Court:  So is it the case that one of the reasons you didn't declare events of default starting back in '02 and continuing [into] '07 , when there were periodic distributions of payments of the consulting fees, was because you hadn't thought of that as amounts that would be payable towards interest on the loan? [Kravit]: That is correct.").)  In addition, each time that Casden made a request to draw down the Loan, he had to and did certify that the Loan was not in default.  (Id. at 191.)  Each of the draw letters certified no event of default.  (See, e.g., Def.'s Ex. 10.)

Casden never received a distribution relating to his ownership of DevCo.  (Tr. 158, 249.)  There were no projects where distributions were made pursuant to Section 6.01 of the CPLLC/DevCo operating agreement.  (Id. at 199, 249.)

Cerberus declared a default on the Note in 2011.  After receiving the notice, Casden called Kravit and stated that no money was due on the Note and that

Consulting Fees were not included in monies owed on the Note. Kravit responded: "I know, I know." (Id. at 249; see also Def.'s Ex. 8 (contemporaneous writing).)

At trial, Kravit was quite clear that the current lawsuit is based upon a reading of the contract and rationale that had not been done or developed previously. (Tr. 168 ("[Kravit]: . . . I would say that in 2011 we developed the rationalization and the arguments that anyone would have made given the documents. Q: So is it true, then, that between 2002 and 2011, you hadn't developed the rationalization to recover interest on the [N]ote, correct? [Kravit]: I would say that we hadn't developed it . . . .").)

The Court finds that the parties never intended that the word "distribution" as used in Section 6.01 of the CPLLC/DevCo operating agreement would include the Consulting Fees, and that the argument that the word "distribution" does encompass those fees is a post hoc, lawyer-and-litigation-driven position having nothing to do with the actual intent of the parties at the time of drafting. The Court finds that the context of the overall set of agreements defines the term "distribution" as used in various places in various documents.

Based on the preponderance of the evidence, the Court finds Casden and Cerberus intended that the Supplemental Agreement, Amendment No. 1 thereto, the Promissory Note, the Pledge Agreement, and the CPLLC/DevCo operating agreement to be read together. These documents are part of a single transaction between Casden and Cerberus, and they are clearly intended to effectuate the transfer of Casden's 10% Interest in CPLLC/DevCo to Cerberus.

II.    CONCLUSIONS OF LAW

The Court's findings are based on the preponderance of the evidence.

A. <u>Contracts Construed According to Plain Language</u>

It is well accepted that courts should construe contracts according to the parties' intent as derived from the contracts' unambiguous terms. The parties' intent is derived "from the plain meaning of the language employed in the agreements," <u>Crane Co. v. Coltec Indus., Inc.</u>, 171 F.3d 733, 737 (2d Cir. 1999) (quotation marks omitted), when the agreements are "read as a whole," <u>W.W.W. Assocs., Inc. v. Giancontieri</u>, 565 N.Y.S.2d 440, 443 (1990). Divining the parties' intent requires a court to "give full meaning and effect to all of [the contract's] provisions." <u>Katel Ltd. Liab. Co. v. AT&T Corp.</u>, 607 F.3d 60, 64 (2d Cir. 2010) (quotation marks omitted). Courts must avoid "interpretations that render contract provisions meaningless or superfluous." <u>Manley v. AmBase Corp.</u>, 337 F.3d 237, 250 (2d Cir. 2003). When the parties' intent is clear — i.e., unambiguous — the contract "must be enforced according to the plain meaning of its terms." <u>Lockheed Martin Corp. v. Retail Holdings, N.V.</u>, 639 F.3d 63, 69 (2d Cir. 2011) (citing <u>S. Rd. Assocs., LLC v. IBM</u>, 826 N.E.2d 806, 809 (N.Y. 2005)). A contract is unambiguous where the contract's terms have "a definite and precise meaning, as to which there is no reasonable basis for a difference of opinion." <u>Id.</u> (citing <u>White v. Cont'l Cas. Co.</u>, 878 N.E.2d 1019, 1021 (N.Y. 2007)).

If reasonable minds could differ about the meaning of contractual language, however, such language is ambiguous. <u>Id.</u> (describing contractual language as

17

ambiguous when it "is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement"). The Court must then turn to extrinsic evidence to determine the parties' intent. State v. Home Indem. Co., 486 N.E.2d 827, 829 (N.Y. 1985) (per curium). While extrinsic evidence generally may not vary or contradict the terms of a fully integrated document, it may be used to interpret facially ambiguous language in the contract. Topps Co., Inc. v. Cadbury Stani S.A.I.C., 526 F.3d 63, 69 (2d Cir. 2008).

B. Integrated Documents

Under New York law, "all writings which form part of a single transaction and are designed to effectuate the same purpose [must] be read together, even though they were executed on different dates and were not all between the same parties." This is Me, Inc. v. Taylor, 157 F.3d 139, 143 (2d Cir. 1998); see also TVT Records v. Island Def Jam Music Grp., 412 F.3d 82, 89 (2d Cir. 2005) accord Nau v. Vulcan Rail & Constr. Co., 286 N.Y. 188, 197 (1941); Commander Oil Corp. v. Advanced Food Serv. Equip., 991 F.2d 49, 52-53 (2d Cir. 1993) (affirming trial court's reading of an "Asset Purchase Agreement" and a lease together because they were "components of a single business transaction" and because "[e]ach depended on the other; neither stood alone").

Whether multiple documents should be read as constituting a single agreement also depends on the intent of the parties. TVT Records, 412 F.3d at 89; Commander Oil, 991 F.2d at 52-53. The determination as to whether the parties

18

intended the writings to constitute an integrated agreement is a question of fact appropriately decided by the court in a bench trial. TVT Records, 412 F.3d at 89; Rudman v. Cowles Commc'ns., Inc., 30 N.Y.2d 1, 13 (1972) ("Whether the parties intended to treat both agreements as mutually dependent contracts . . . is a question of fact . . . [T]he primary standard is the intent manifested, viewed in the surrounding circumstances."); see also Arciniaga v. Gen. Motors Corp., 460 F.3d 231, 237 (2d Cir. 2006) (The circumstances surrounding the transaction is relevant to answering the question of whether multiple documents were meant to be read together.)

In TVT Records, the Second Circuit found that a "Heads of Agreement" ("HOA") and "side-letter agreement" were "one agreement." TVT Records, 412 F.3d at 89. This determination was based, inter alia, on the fact that the documents were intended to effectuate the same result. Id. The parties under the side-letter agreement were obligated to honor all of the terms and conditions of the HOA. The Court also found that the fact that the documents had been negotiated and executed at different times and even had different parties did not dictate a contrary result. Id. at 90. Similarly, in This is Me, the Second Circuit found that separate agreements governing the video and live performances of a play should be read together because they were "components of a single project" as evidenced by the intent of the producers when they began the project. This is Me, 157 F.3d at 145.

19

C.  Applying the Law to the Facts

1.  When the agreements are read together, there is no breach.

As set forth above, this Court has found by a preponderance of the evidence that various agreements — notably the Supplemental Agreement and Amendment No. 1 thereto, the Consulting Agreement, the Promissory Note, the Pledge Agreement, and the CPLLC/DevCo operating agreement, were all intended to be read together.  The circumstances surrounding the arrangement for Cerberus effectively to acquire half of Casden's interest in CPLLC indicate that the parties intended that the Consulting Fees were transaction consideration.  As such, they were not among the types of distributions the parties intended would be used to repay the Loan.  When the Supplemental Agreement is read together with the other agreements discussed above, it is clear that the repayment of the Loan was to be from distributions relating to the operations of CPLLC/DevCo, not from the Consulting Fees.  Thus, when all of the agreements are read together, Casden has not breached the Note or Pledge Agreement and judgment must be entered in his favor.

2.  Certain agreements must be read together as a matter of law.

Even if this Court were not to read all of the transaction documents together as a reflection of the parties' intent, the result would not change, as the Court finds as a matter of law the plain language of the agreements unambiguously requires them to be read together.  See Aceros Prefabricados, S.A. v. TradeArbed, Inc., 282 F.3d 92, 97 (2d Cir. 2002) ("Applying New York law, we have found that [p]arties to

a contract are plainly free to incorporate by reference, and bind themselves *inter sese* to, terms that may be found in other agreements.") (internal quotations omitted).  For instance, the Amendment No. 1 to the Supplemental Agreement specifically anticipates that the "XYZ LLC and the other agreements entered into between the parties hereto . . . in connection with the Transactions" should be read together.  (Trial Ex. 3 at Sec. 1.07.)  That Amendment provides that in the event of an inconsistency or conflict between any of those documents, the Supplemental Agreement would control.  (Id.)

As a result, as a matter of law, the payment obligations for the Loan are governed by the plain meaning of Supplemental Agreement.  See Shaw Grp. Inc. v. Triplefine Intern. Corp., 322 F.3d 115, 121 (2d Cir. 2003) (finding under New York law that "words and phrases in a contract should be given their plain meaning").  A plain reading of the Supplemental Agreement makes it clear that repayment obligations were based on distributions received by Casden from his interests in CPLLC/DevCo.  The evidence at trial was clear that Casden never received any such distributions.

Accordingly, as a matter of the plain reading of the contract language, Casden has not breached his obligations under the Note or Pledge Agreement.

### 3. The meaning of "any distributions."

The essence of plaintiff's claim, however, is not based on either of these first two readings of the transaction documents.

Instead, plaintiff asserts that the phrase "any distributions" as used in the Note is unambiguous — and necessarily includes all distributions of whatsoever nature that Casden received from CPLLC/DevCo. These distributions would, according to plaintiff, include those received as Consulting Fees.

There is some initial appeal to this argument — but in the context of the overall transaction, it cannot withstand even modest scrutiny. Plaintiff's reading requires that the Court ignore the existence of both the Supplemental Agreement and Amendment No. 1. The terms of those agreements do not allow them to be cast aside in that manner. As stated, Section 2.02 of Amendment No. 1 ratifies, confirms and incorporates by reference the Supplemental Agreement. (And while the Supplemental Agreement may have been executed in December 2001, Amendment No. 1 was executed at the time of the closing in March 2002.)

Moreover, Section 1.07 of Amendment No. 1 specifically anticipates that other agreements executed in connection with the transaction might conflict or be inconsistent — and states clearly that the Supplemental Agreement "shall control." Thus, any reading of the word "distribution" must be done against the Supplemental Agreement. Such a reading requires that the repayment obligations be understood as (1) limited to distributions received as a result of CPLLC/DevCo's activities, or (2) at the very least, that the term "distributions" is rendered ambiguous. At best, the Supplemental Agreement complicates the meaning of that term. Once the Court considers extrinsic evidence in connection with the term "distribution" — and specifically inquires into the intent of the parties — it is clear

22

that Consulting Fees were never intended or expected to be encompassed by that term when drafted.  Again, this requires a determination of no breach by Casden.

Thus, plaintiff's claim of breach of contract fails as a matter of fact and law.

III.    CONCLUSION

For the reasons set forth above, the Court enters judgment for defendant on Counts I –III.

The Clerk of Court is directed to enter judgment as stated and to terminate this action.

SO ORDERED.

Dated: New York, New York
      June 20, 2013

                                           _____
                                           KATHERINE B. FORREST
                                           United States District Judge